FILED UNDER SEAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

| | | |
|---|---|---|
| BearingPoint, Inc., | ) | **PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER** |
| Plaintiff, | ) | |
| v. | ) | Case Nos. 08409C, 08-419C, 08-432C, 08-454C and 08-474C |
| The United States | ) | Judge Margaret M. Sweeney |
| Defendant. | ) | **REDACTED VERSION** |

POST-AWARD PROCUREMENT PROTEST COMPLAINT

Plaintiff BearingPoint, Inc., by its undersigned attorneys, hereby submits its Complaint and states and alleges as follows:

PARTIES

1. Plaintiff BearingPoint, Inc. (BearingPoint) is a Delaware corporation with its principal place of business at 1676 International Drive, Tyson's Tower, McLean, VA 22102.

2. Defendant is the United States of America (the Government), acting by and through the United States Army (Army or Agency).

JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1491(a) and (b). BearingPoint is an interested party as BearingPoint was an unsuccessful offeror in an Army procurement for information technology-related program management support services, under what is known as the Program Management Support

Services-2 (PMSS-2) procurement. BearingPoint should have received a contract award absent the Army's violations of statutes and regulations in the awarding of the PMSS-2 contracts.

## NATURE OF CASE

4. BearingPoint protests the Army's award of contracts to Systems Research and Applications Corporation (SRAC), Booz Allen Hamilton (BAH), and Wyle Information Systems, LLC (Wyle), under Solicitation No. W91QUZ-07-R-0007 (Solicitation or RFP) for information technology-related program management support services under the PMSS-2 procurement.

5. The Army notified BearingPoint of these awards on March 20, 2008. BearingPoint timely filed and began to pursue a protest action at the United States Government Accountability Office (GAO). The GAO docketed BearingPoint's protest as B-400055.5. Additional disappointed offerors also filed and pursued protests of the PMSS-2 award decisions until the GAO dismissed those actions on June 5, 2008.

6. A review of Protective Material during the GAO protest established that:

a. In its best value award decision, the Army abandoned the RFP's weighting of the evaluation factors, gave far too much emphasis to price (labor hour rates), and effectively converted the procurement into a technically acceptable, low price procurement, which was particularly inappropriate in a procurement where the work would be competed in the future among the awardees by means of firmed fixed price or time and material task orders.

b. The Army's evaluation of BAH's and Wyle's Small Business Participation factor was inconsistent with the evaluation criteria that the Army used in evaluating offers, subjecting BearingPoint to unequal treatment in the evaluation of the Small Business Participation factor.

c. Systems Research and Applications Corporation (SRAC) improperly utilized and the Agency improperly evaluated, particularly with respect to the Corporate Capability and Performance Risk factors, [redacted]

d. The Army violated FAR § 3.501 when it failed to take appropriate action to ensure that the awardees would not recover losses from buying in through the task order process.

e. The Army failed to reasonably evaluate the awardees' prices offered by failing to analyze the low labor rates upon which the awardees based their offers.

f. The Army failed to conduct meaningful discussions with BearingPoint when it failed to inform BearingPoint that its labor rates were too high or that the Government had decided to emphasize price in the award decision.

g. The Army's decision to award contracts to BAH, SRAC, and Wyle instead of to BearingPoint, or in the alternative without including BearingPoint as an additional awardee, was unreasonable and inconsistent with the stated evaluation criteria.

7. On June 5, 2008, the GAO notified BearingPoint that the GAO was dismissing BearingPoint's protest as a result of Femme Comp. Inc. filing an action with respect to the PMSS-2 Procurement in the United States Court of Federal Claims.

COUNT I -- THE ARMY'S FAILURE TO CONDUCT ITS BEST VALUE TRADE OFF CONSISTENT WITH THE STATED EVALUATION CRITERIA PREJUDICED BEARINGPOINT

8. BearingPoint incorporates paragraphs 1 to 7 in their entirety.

9. While the Government contemplated making five awards in this procurement, including at least two awards to small business offerors, the Solicitation was specific that the Army reserved the right to make more than five awards in total, and more than three awards in the first group categorized as being most advantageous to the Government regardless of size. RFP at M.2.1.

10. The Government is required to state in the Solicitation "all significant factors and subfactors which the head of the agency expects to consider evaluating" and to state the "relative importance assigned to each of those factors and subfactors." *See* 10 U.S.C. §§ 2305(a)(2)(A)(i)-(ii); FAR 15.101-1(b)(1)-(2).

11. The RFP established five factors, some with subfactors, that the Solicitation required the Army to evaluate in determining which contractors should receive award of contracts:

- **Factor 1 – Corporate Capability**
  - Subfactor 1 – Knowledge of and Experience with DoD/Army Acquisition Policies and Processes
  - Subfactor 2 – Performance Capability and Resources to Support PEO EIS and CIO/G6 Programs
- **Factor 2 – Performance Risk**
- **Factor 3 – Technical/Management**
  - Subfactor 1 – Understanding of the PM Support Required
  - Subfactor 2 – Project Management Plan
- **Factor 4 – Price**

- **Factor 5 – Small Business Participation**

RFP at M.3.1.

12. The Solicitation established the relative importance of the factors to each other and overall. The Solicitation established that Corporate Capability was more important than Performance Risk, which in turn was more important than Technical/Management, which was more important than Price. The Solicitation clearly stated that collectively the non-price evaluation factors were significantly more important than the Price factor:

> Factor 1 is more important than Factor 2. Factor 2 is more important than Factor 3. Factor 3 is more important than Factor 4. Factor 4 is more important than Factor 5. While the Price Factor will be an important part of the integrated selection decision, the non-price evaluation factors, collectively, are significantly more important than the Price factor. Under Factor 1, Subfactor 1 is more important than Subfactor 2. Under Factor 3, the Subfactors are comparatively equal in importance.

RFP at M.3.2.

13. The Solicitation implicitly established that Factor 1, Corporate Capability, by itself, was significantly more important than Factor 4, Price. The RFP defines "Significantly More Important" to mean that "[t]he criterion is substantially more important than another criterion. The criterion is given far more consideration than another criterion." RFP at M.3.2.

14. Rather than awarding contracts to offerors that represented the best value to the Government in accordance with the Solicitation's mandated evaluation criteria, the Army instead made award to the three technically acceptable large business offers with the lowest evaluated total contract life price. As such, the Army improperly converted a best value procurement into a technically acceptable, low price procurement.

15. In the Source Selection Document (SSD), the Source Selection Authority (SSA) recognized the superiority of BearingPoint's (Offeror PW) proposal in the non-price factors

compared to the proposals of BAH (Offeror PY) and Wyle (Offeror PS). Yet in both instances, the SSA determined that BAH or Wyle offered the best value in comparison to BearingPoint's proposal because of their lower evaluated prices, notwithstanding the Solicitation's mandate that non-price factors were significantly more important than price.

16. In making the BearingPoint/BAH comparison, the SSA found BearingPoint superior in the [redacted] but found BAH offered best value due to its low price.

17. In comparing BearingPoint (Offeror PW) to Wyle (Offeror PS) the SSA determined that BearingPoint was superior in the [redacted] yet determined that Wyle offered best value based on Wyle's low price.

18. Thus, notwithstanding BearingPoint's clear superiority over BAH and Wyle in the non-price evaluation factors, the SSA determined that BAH and Wyle offered best value in comparison to BearingPoint due to their lower prices. The SSA offered no detailed explanation as to why BearingPoint's superiority in the non-price evaluation factors was not sufficient to justify award to BearingPoint in a procurement wherein non-price factors were significantly more important than the price factor. This error was particularly egregious because the contract will be performed through the award of task orders which will be competed in the future.

19. The awarded price for BAH was $285,885,983, for SRAC it was $310,608,221, and for Wyle it was $311,259,554. The evaluated prices of the awardees were substantially lower than the Independent Government Price Estimate (IGPE). The IGPE was approximately $478 million. BearingPoint's evaluated price was [redacted]



DC1 30233384.2

20. The rationale for Price being of such limited importance in comparison to the non-price factors is obvious based on the nature of the procurement. The awarded contracts to BAH, SRAC, and Wyle each only guaranteed $20,000 of work. As the SSA noted in the SSD, individual task orders will be issued to the awardees on a Firm Fixed Price (FFP) or Time and Material (T&M) basis, following competition among the multiple successful awardees.

21. The Government identified in the Solicitation the number of hours per labor category that would be used to determine a hypothetical contract cost. Offerors then identified the hourly labor rate that they would charge in their contract. The Record demonstrates that the two incumbent contractors who had been successfully performing the work that would continue to be performed under the PMSS-2 Contract [redacted] in most categories than did any of the three awardees.

22. [redacted] differences exist throughout the list of labor categories between the three awardees and the two incumbent contractors. This [redacted] difference in hourly rates is particularly important in a procurement where non-price evaluation factors are significantly more important than Price, and the work (which the IGPE had estimated to be in the $478 million range) will be awarded on a Firm Fixed price or T&M basis on individually competed task orders among all awardees.

23. In a procurement where the Government seeks labor rates, but not estimated hours, and will award future task orders based on a contractor's estimate of how long it will take to perform the work, it is possible to game the procurement by bidding low labor hour rates, using less qualified personnel in the offer, and then proposing significantly more hours when bidding on the task orders than would a contractor using a higher paid, more experienced individual to perform the work.

24. Price as an evaluation factor becomes less significant in the initial contract award because the true price competition will be for the task orders. In the initial award of contracts the Government is attempting to identify the superior contractors based on the non-price evaluation factors. Higher labor rates do not necessarily mean higher task order pricing, and certainly not to the degree indicated by the price evaluation of a stated number of hours. In competing for a Firm Fixed price task order, an offeror may be able to base its proposal on far fewer hours for a labor category because it is using more experience/competent individuals. Thus, the procurement emphasized the non-price evaluation factors because corporate capability, performance risk and technical/management were all individually more important than price, and taken together significantly more important than price for purposes of the initial contract awards.

25. In reaching the best value decision, the SSA ignored that the evaluated price for purposes of the procurement was nothing more than the highest proposed labor rate per category multiplied by a set number of hours, and that the price determined by this approach gave no assurance as to the total price that the Government would pay as it competed task orders under the awarded contracts. Thus the Solicitation logically emphasized the importance of non-price evaluation factors over price in the award decision.

26. The Government had the ability to award more contracts than it did. This would have been a logical approach as if the awardees were gaming their proposal and needed extra hours to get the task order work done in comparison to BearingPoint this would show up in the evaluation of task orders and the Government would not have eliminated the ability of contracting task orders with the technically superior offeror. If on the other hand, the awardees proposed to do fixed price task orders at a price significantly lower than BearingPoint, there was no requirement to award BearingPoint any of that work. Accordingly the SSA's abandonment of

the evaluation scheme which heavily weight non-price factors over price was particularly inappropriate in this factual circumstance.

COUNT II -- THE ARMY'S EVALUATION OF BAH'S AND WYLE'S SMALL BUSINESS PARTICIPATION FACTOR WAS INCONSISTENT WITH THE EVALUATION CRITERIA THAT THE ARMY UTILIZED IN EVALUATING OFFERS, AND THUS PREJUDICED BEARINGPOINT

27. BearingPoint incorporates paragraphs 1 to 26 in their entirety.

28. The Army established a minimum mandatory requirement in the Solicitation for Small Business Participation of 20% and non-mandatory objectives for five small business subcategories: (1) Small Disadvantaged Business (objective)-- 6%; (2) Woman-Owned Small Business (objective) -- 5%; (3) Service-Disabled Veteran-Owned Small Business (objective) -- 3%; (4) Veteran Owned Small Business (objective) -- 3%; and (5) Hub-Zone Small Business (objective) -- 1%. RFP at M.4.52.

29. The Government established in the Solicitation that for evaluation purposes it would consider whether the offeror's approach met or exceeded the minimum mandatory requirement for small business participation, as well as the objectives for all the subcategories:

> The Government will evaluate the Offeror's approach to meeting or exceeding the Government's minimum mandatory requirement for overall Small Business participation and the non-mandatory objectives (see table below) for participation by Small Disadvantaged Business, Woman-Owned Small Business, Service-Disabled Veteran-Owned Small Business, Veteran Owned Small Business, HUBZone Small Businesses, and HBCU/MI in the performance of the PMSS2 contract. The amount by which the proposed percentage exceeds the overall small business category percentage and the amount by which the proposed percentages exceed the small business sub-category percentages will be considered. The assessment will include the extent to which such firms are specifically identified in the proposals, the extent of commitment to use such firms (for example, enforceable commitments are more significant than non-enforceable commitments); the extent of participation of such firms in terms of the value of the total acquisition; and, for large businesses only, an assessment of the Offerors' Small Business goals for FY 2006 for

> the DoD and other Federal Government agencies and the actual goals achieved.

RFP at M.4.5.1.

30. In the Source Selection Plan, the Army established that ratings for the Small Business Participation factor would be based on whether the offeror met or exceeded all the goals set forth in the Solicitation:

> BLUE Outstanding - Outstanding quality; proposed participation significantly exceeds all solicitation goals; very good probability of success with overall low degree of risk in achieving extent of proposed participation. GREEN Good - High quality; proposed participation significantly exceeds some solicitation goals, and meets or exceeds all goals; good probability of success with overall low to moderate degree of risk in achieving extent of proposed participation. YELLOW Fair - Adequate quality; proposed participation meets or exceeds all solicitation goals; fair probability of success with overall moderate degree of risk in achieving extent of proposed participation.

Thus, it is clear that unless an offeror significantly exceeds *all* Solicitation goals that it could not obtain a Blue/Outstanding rating. Similarly if a proposal does not significantly exceed some solicitation goals and meets or exceeds all other goals it could not obtain a Green/Good score.

31. BearingPoint received a [redacted] score for Small Business Participation, [redacted]

| CATEGORY | REQUIREMENT/ OBJECTIVES | BEARINGPOINT'S PROPOSAL |
|---|---|---|
| Small Business (requirement) | 20% | [redacted] |
| Small Disadvantaged Business (objective) | 6% | [redacted] |
| Woman-Owned Small Business (objective) | 5% | [redacted] |
| Service-Disabled Veteran-Owned Small Business (objective) | 3% | [redacted] |
| Veteran Owned Small Business (objective) | 3% | [redacted] |
| Hub-Zone Small Business (objective) | 1% | [redacted] |
| HBCU/MI (objective) | Positive Goal | [redacted] |

32. Wyle proposed to [redacted] Wyle improperly received a Green/Good score, [redacted] rather than a



DC1 30233384.2

Yellow/Fair score when [redacted] under the Government's evaluation scheme. Wyle should have received a Yellow/Fair for this evaluation factor rather than the Green/Good it received.

33. BAH proposed to [redacted] BAH improperly received a Blue/Outstanding score rather than a Green/Good score when it [redacted] This evaluation was not only inconsistent with the evaluation criteria, it was unreasonable to give BAH a Blue, while [redacted] for the Small Business Participation factor.

COUNT III -- THE GOVERNMENT'S EVALUATION OF SRAC'S PROPOSAL WAS UNREASONABLE BECAUSE THE GOVERNMENT GAVE SRAC CREDIT FOR [redacted]

34. BearingPoint incorporates paragraphs 1 to 33 in their entirety.

35. Systems Research and Applications Corporation (SRAC) submitted a proposal and won one of the three PMSS-2 contracts which the Army awarded to large business. SRAC's proposal stated that it was being submitted by [redacted] SRAC has a different [redacted] The pertinent Non Disclosure Agreements SRAC submitted identifies [redacted] The Army awarded Contract No. W91QUZ-07-R-0007 to Systems Research and Applications Corporation (SRAC) on March 20, 2008. The award document identifies SRAC's CAGE Code as 6R517.

36. SRAC was the entity that submitted a proposal and to whom the Army awarded a contract. [redacted]

37. In the Performance Risk Section of SRAC's proposal, one of the three contracts that SRAC submitted pertained to the [redacted]

38. In the Corporate Capability section of its proposal, SRAC refers to the capabilities of [redacted] Specifically, SRAC repeatedly cites to the [redacted] section of its proposal,

but does not include [redacted] elsewhere in its proposal.

39. [redacted] in response to the PMSS-2 Solicitation.

40. Nowhere in the proposal does [redacted] In the Master Labor Table SRAC [redacted] However, throughout the proposal SRAC [redacted]

41. The Army failed to recognize the difference between [redacted]

42. As the proposal of Systems Research and Applications Corporation does not [redacted] it was improper for SRAC to use, and for the Army to consider the [redacted] As such, the Government's evaluation of the SRAC proposal is fundamentally flawed. This error prejudiced BearingPoint because SRAC's unfairly inflated scores for [redacted]

[redacted] impacted the Agency's best value comparison between BearingPoint and SRAC.

COUNT IV --THE ARMY VIOLATED FAR § 3.501 WHEN IT FAILED TO TAKE APPROPRIATE ACTION TO ENSURE THAT THE AWARDEES WOULD NOT RECOVER LOSSES FROM BUYING-IN THROUGH THE TASK ORDER PROCESS

43. BearingPoint incorporates paragraphs 1 to 42 in their entirety.

44. The labor rates the large-business awardees, BAH, SRAC, and Wyle, offered were [redacted] When the Army reviewed BAH, SRA's and Wyle's offered labor rates, it should have determined that these offerors appeared to be "buying-in" for the purpose of winning contract awards, with the actual task order prices likely to be higher than the evaluated price because of the higher number of labor hours necessary for the awardees to perform the work with cheaper, less qualified employees in future task orders.

45. The FAR defines "buying-in" as '[S]ubmitting an offer below anticipated costs, expecting to -- (1) Increase the contract amount after award (e.g., through unnecessary or excessively priced change orders), or (2) Receive follow-on contracts at artificially high prices to recover losses incurred on the buy-in contract. FAR § 3.501-1.

46. The FAR does not prohibit offerors from "buying-in" in order to win a contract award. However, the FAR acknowledges that buying-in "may decrease competition or result in poor contract performance." FAR § 3.501-2. Accordingly, the FAR imposes an express obligation on the contracting officer to identify instances of buying-in, and to take steps to protect the Government from receiving poor performance or from overpaying for contract performance, or performance of follow-on contracts.

47. The temptation to "buy-in" by submitting unrealistically low labor rates was particularly great in this procurement because the offeror proposing the lowest labor rates would obtain the highest score for price. In fact, because the Army evaluated all offerors' pricing based upon the same standard number of hours for certain tasks, offerors such as BAH, SRAC, and Wyle, who proposed unrealistically low labor rates were rewarded with high ratings for price. Moreover, contrary to the evaluation plan, these low evaluated prices became outcome determinative in the Army's award decisions.

48. The Army had an obligation to identify that the awardees were buying-in, and to take steps to guard against their recovery from the Government for these unreasonably low labor rates in future Task Orders. The Army failed to meet this obligation, in violation of FAR § 3.501-2 to BearingPoint's severe detriment.

COUNT V -- THE ARMY FAILED TO REASONABLY EVALUATE PRICES

49. BearingPoint incorporates paragraphs 1 to 48 in their entirety.

50. The evaluated Total Contract Life Prices of BAH, Wyle and SRAC was so far below the prices that the Army is currently paying for these same services, that it was unreasonable for the Army to assume that the anticipated work could be performed at the labor rates the awardees proposed. At the debrief, the Army indicated that the total ceiling price of all the contracts awarded stated in the RFP, $478,642,912.00, was derived from all the work currently being performed under other contracts, which was expected to migrate to the new PMSS-2 contracts. Thus, the Army applied the labor rates it is currently paying under existing contracts and the hours currently being expended and projected that data to determine the ceiling price for the five year period of performance of the new contracts.

51. Here the Army was on clear notice that the labor rates of the awardees are far below the rates currently being charged for the same work. By failing even to attempt to

ascertain if the awardees' rates were reasonable, the Army did not meet its statutory obligation to determine the cost to the government of the contract performance. While the general rule is that agencies are not obligated to conduct a cost realism analysis for contracts with fixed labor rates, the awardees' rates here are so much lower than the current rates for the same work, the Army could not be assured that the contractors would, in fact, be assuming the cost risk.

52. The fact that the awarded contracts contemplate Fixed Price and Time and Material task orders makes the Army's failure even more egregious. When the awardees submit proposals on individual T&M task orders, they have absolutely no risk. Irrespective of the number of hours each may propose, if the work is not completed when the task order awardee has expended the proposed ceiling hours/price, the contractor has no obligation to continue performance. The Army is then left with the choice of either increasing the ceiling price of the task order, or not having the work completed. Because it is the Army, and not the contractor, that, in actuality, assumes any cost growth risk when performance is on T&M basis, the Army was obligated to conduct at least some examination of the realism of the offerors proposed labor rates.

53. When seeking proposals for Fixed Price task orders, the offerors must use the labor hour rates it proposed. However, the offeror will be able to bid as many hours as it deems are necessary to perform the work. Thus lower hourly rates does not necessarily equate to lower task order pricing.

54. At the debrief, the Army indicated that the price evaluation did not even consider if any of the awardees' rates were too low.

55. The RFP required the Government to evaluate the relative extent to which the offerors could provide the "qualified resources" necessary to support the PEO/EIS and CI0/G-6



DC1 30233384.2

programs. RFP at M.4.1.2; M.4.1.2.3. The Solicitation required the Government to evaluate the relative merits of the offerors' methodologies for "recruitment, training and retention of qualified and security-cleared personnel." RFP at M.4.3.2.3. BearingPoint and L-3 had been [redacted] It is indisputable that what an offeror proposes to pay its labor force is a critical element of a company's ability to recruit and retain qualified individuals in the quantities necessary to meet an agency's needs. Thus this is a critical portion of the Agency's exercise in determining whether the offeror can provide the qualified resources necessary to support the PEO/EIS and the CIO/G-6 programs. This the Army failed to do. The Record indicates no effort on the Army's part to determine whether the job descriptions and qualifications described in the offeror's labor categories were sufficient to meet the RFP requirements and whether the labor rates proposed by each of the offerors were sufficient to allow that offeror to recruit and retain personnel with the skills and qualifications necessary to perform the PMSS-2 contract work.

56. Because the Army failed to perform such an analysis, the Army failed to realize the higher quality personnel being provided by BearingPoint, and the greater likelihood that BearingPoint would be able to retain its workforce than the ultimate awardees. Not only was the evaluation thus faulty, but the SSA failed to take this point into consideration when making the best value decision.

57. The Record is clear that the Army did not consider whether low labor rates would result in more hours for the same work being proposed or done on task orders. Given the substantial and unexplainable difference in labor rates, and the fact that the evaluated price was based on all offerors proposing on the same number of labor hours, such an analysis was critical

during the evaluation process, as well as the award process. This the Government failed to accomplish to BearingPoint's severe detriment.

COUNT VI – THE ARMY FAILED TO CONDUCT MEANINGFUL DISCUSSIONS WITH BEARINGPOINT

58. BearingPoint incorporates paragraphs 1 to 57 in their entirety.

59. Statute and regulations require that when the Government engaged in discussions with an offeror that these discussions be meaningful. *See* 48 CFR 15.306.

60. The Army engaged in discussions with BearingPoint. At no time during these discussions did the Army inform BearingPoint that its labor rates, and thus its price, were too high, or that notwithstanding the evaluation criteria, the Army was going to emphasize price in its award decision.

61. Consequently, the Army failed to conduct meaningful discussions with BearingPoint to BearingPoint's severe detriment.

COUNT VII -- THE SSA'S BEST VALUE TRADE OFFS WERE UNREASONABLE AND INCONSISTENT WITH THE STATED EVALUATION CRITERIA

62. BearingPoint incorporates paragraphs 1 to 61 in their entirety.

63. In performing best value tradeoffs between BearingPoint/BAH, and BearingPoint/Wyle, the SSA abandoned the evaluation criteria by emphasizing Price over Non-Price factors when the Solicitation's evaluation criteria mandated that Non-Price factors were significantly more important than Price. Such an emphasis on Price not only was inconsistent with the stated evaluation criteria, but was particularly nonsensical because the actual work was to be awarded through competitively procured Firm Fixed Price and Time and Material task orders.

64. BearingPoint's superiority in the Non-Price factors was even greater than the Record indicates because the Army mistakenly gave BAH and Wyle higher rankings than they were entitled to receive under the evaluation criteria for the Small Business Participation factor.

65. The Army improperly given SRAC credit for [redacted] when evaluating the SRAC proposal. A proper evaluation of SRAC's proposal would have resulted in SRAC receiving lower scores for the Non-Price evaluation factors, and a determination that BearingPoint's proposal was superior with respect to the Non-Price factors.

66. The Army failed to consider whether the awardee's low price labor rates were realistic or reasonable, or to analyze the impact on task order costs of the need for more labor hours to accomplish the work.

67. The Army failed to protect against a buy-in in accordance with FAR 3.501-2.

68. The Army failed to engage in meaningful discussions with BearingPoint regarding its labor rates, or the Army's change in procurement emphasis, thus impacting the relative merits of BearingPoint's offer, compared with the awardees' offers in the best value decision.

69. The Government has committed highly prejudicial error to BearingPoint's detriment in evaluating various proposals and making the PMSS-2 awards to BAH, Wyle and SRAC. BearingPoint submits that it offers best value in comparison to each of the three awardees.

## PRAYER FOR RELIEF

WHEREFORE, BearingPoint respectfully requests the Court to grant judgment for BearingPoint in this Action, and to Order the following relief:

1. A Declaration that the Army's awards to BAH, Wyle and SRAC lack a rational basis and are unreasonable or irrational, and thus arbitrary and capricious;

2. (a) A Permanent Injunction ordering that the contracts to BAH, Wyle and SRA be terminated; (b) that only [redacted] be considered in the re-evaluation; and (c) that a new source selection decision be made that is in accordance with the Solicitation's stated evaluation criteria;

3. A Declaration that the Army failed to engage in meaningful discussions with BearingPoint;

4. A Declaration that BearingPoint is entitled to equitable relief and money damages, for the Department of the Army's breach of the implied-in-fact contract of good faith, fair dealing, and honest consideration that the Department of the Army entered into with BearingPoint when the competition under Solicitation Number W91QUZ-07-R-0007 commenced;

5. Such further relief as the Court may deem just and proper.

Respectfully submitted,

/s Kevin P. Connelly

Kevin P. Connelly, Esq.
Seyfarth Shaw LLP
815 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006-4004
202-828-537 (direct dial)
202-641-9274 (facsimile)
*Counsel of Record for Plaintiff BearingPoint, Inc.*

Dated: June 30, 2008

Of Counsel:

Joseph J. Dyer, Esq.
Grace Bateman, Esq.
815 Connecticut Avenue, N.W., Suite 500
Washington, DC 20006-4004